# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **SARA SAIDMAN,** <br><br> *Plaintiff, on behalf of herself and all others similarly situated,* <br><br> v. <br><br> **SCHLUMBERGER TECHNOLOGY CORPORATION,** <br><br> *Defendant.* | **Case. No. 4:20-cv-02193** <br><br> <u>**CLASS ACTION COMPLAINT AND JURY DEMAND**</u> |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

Plaintiff Sara Saidman ("Plaintiff" or "Class Representative"), by and through her undersigned attorneys, Sanford Heisler Sharp, LLP and Shellist Lazarz Slobin LLP, brings this action on behalf of herself and all similarly situated women against Defendant Schlumberger Technology Corporation ("Schlumberger" or "the Company"). Schlumberger is the largest oilfield services company in the world, earning more than $32 billion in revenue each year and providing services on hundreds of oil rigs in North America alone. Men have dominated these field-based positions on oil rigs for decades, accounting for approximately 95% of the employees staffed on each rig. Plaintiff, who was just twenty-one years old when she began working for Schlumberger as a Field Engineer at onshore oil rigs across the country, brings this action under Title VII of the Civil Rights Act of 1964 to remedy the pervasive sexual harassment and gender discrimination to which she and other similarly situated women working on oil rigs were subjected. Plaintiff alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.

# I.     <u>INTRODUCTION</u>

1.      In Schlumberger's playbook, oil rigs and women do not mix.  Approximately 95% of Schlumberger employees who work on oil rigs are male.  The few women who are hired face a terrorizing environment where men discriminate against their female colleagues with impunity.  Schlumberger has knowingly permitted male workers to treat women who work on oil rigs as sex objects and second-class citizens, intentionally turning a blind eye to the pattern of sexual harassment, sex (gender) discrimination, and physical danger that women are subjected to nationwide.  Women who work on oil rigs are sexually assaulted, sexually harassed, groped, leered at, and treated as sexual objects by their male colleagues.  They are referred to as "cunts," "bitches," and "sluts" who are undeserving of equal pay.  And this anti-woman animus does not exist in a vacuum: women working on Schlumberger oil rigs nationwide have reported a hostile work environment in which pervasive sexual harassment and discrimination is standard operating procedure.

2.      Schlumberger ensures that women who work on rigs are vulnerable to this onslaught of sexual harassment and gender discrimination.   The Company requires women who work on rigs to share living quarters (typically a small trailer) and even a bedroom with multiple men who work on the rig—often the same men who are sexually harassing and discriminating against them.  Sometimes these trailers have no locks, making it impossible for women to find even a moment's privacy from the harassers with whom they work.  Because these oil rigs are often in remote locations far from the nearest town, women cannot escape this harassment and discrimination.  They are forced to live with and work among their harassers.

3. Plaintiff Sara Saidman is one of these women. Ms. Saidman was just twenty-one years old when she began working at Schlumberger in May 2016. She worked on numerous rigs in numerous locations across the country, but her experiences were the same: She was objectified, insulted, groped, threatened, retaliated against, and exposed to physical danger by her colleagues on the oil rigs. As just one example, one of Ms. Saidman's male colleagues (with whom she was forced to share living quarters) encouraged the other men working on the rig to break into her bedroom while she was sleeping and ignore her if she resisted sexual advances. He assured other male workers that Ms. Saidman "likes it whether or not she wants it" and "the more she screams, the more she wants it."

4. Women who have the courage to seek recourse, including Ms. Saidman, are promptly blacklisted by Human Resources and management personnel. Schlumberger makes it nearly impossible for women who have been sexually harassed to find recourse. The Company's formal policies instruct employees who have been harassed to *"politely" confront the harassers themselves* before seeking assistance from management. Not unsurprisingly, when formal complaints are lodged, Schlumberger's preferred course of action is to ignore them entirely. On the rare occasions when a complaint is deemed worthy of a response, Schlumberger dismisses them as "just oil field talk" or "a joke." The women who complain are then retaliated against as punishment. As one former employee warned, "[Human Resources] is not your friend at this company, they are your enemy."

5. Schlumberger is widely heralded as the king of the oil and gas industry. The largest oilfield services company in the world, Schlumberger earns more than $32 billion in revenue each year and has been recognized as a Fortune 500 Global company for nineteen years. But when it comes to gender equality, Schlumberger is hardly a leader. The Company goes to

great lengths to shield this simple truth from the public eye, instead celebrating itself as a leader in gender diversity. As the Company's website boasts: "Diversity has played a major role in the development of Schlumberger, and for nearly 25 years gender balance has been a major focus for us . . . Today, diversity runs through Schlumberger at every job level."[1] This could not be further from reality: Women account for barely 16% of Schlumberger's global workforce, and women occupy approximately 5% of field-based positions.[2] Schlumberger itself acknowledges that "decades of male dominance" have led to these abysmal gender diversity numbers.

6. For the women at Schlumberger who occupy a razor-thin slice of field-based positions on oil rigs (approximately 5% of available positions), the picture is grim: Women who work on oil rigs confront not just a glass ceiling, but an impenetrable rock and shale fortress.

## II. PARTIES, JURISDICTION, AND VENUE

7. **PLAINTIFF SARA SAIDMAN** is a woman who, at all times relevant to this action, was an employee of Schlumberger. From January 2017 until her termination, Ms. Saidman worked for Schlumberger in Texas.

8. **DEFENDANT SCHLUMBERGER TECHNOLOGY CORPORATION** (NYSE: SLB) is an international oilfield services company headquartered in Houston, Texas that employs more than 100,000 professionals worldwide. At all relevant times, Schlumberger was

---

[1] *See* https://careers.slb.com/newsroom/women-in-tech.

[2] These statistics can be found on Schlumberger's website (https://www.slb.com/globalstewardship/employment-human-capital.html) and the Company's annual report on gender diversity and the gender pay that Schlumberger is required, by law, to compile and publish annually. According to the 2018 report (https://www.slb.com/-/media/files/about-us/2018-schlumberger-uk-gender-pay-gap-report.ashx), "[f]ield-based positions continue to be filled mainly by men. In 2018, 5.4% of the field roles in Schlumberger . . . were held by women." This is a systemic issue in the oil industry. A 2018 Gender Diversity Study by the Petroleum Equipment & Services Association (https://pesa.org/wp-content/uploads/2018/04/PESA-Gender-Diversity-Report-April-2018.pdf) found that women occupy just 8% of technical operational roles (such as Field Engineers) in the United States. The staggering gender disparity at Schlumberger reaches the upper echelons of the Company: Thirteen out of fourteen Executive Management positions at Schlumberger are held by men (https://www.slb.com/who-we-are/executive-management).

Plaintiff's employer within the meaning of all applicable federal statutes and regulations. Defendant may be served through its registered agent for service of process, Capitol Corporate Services, Inc., 206 E 9th St., Suite 1300, Austin, Texas 78701.

9.      This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendant conducts substantial business in the Southern District of Texas, and because, upon information and belief, unlawful employment practices originated in this District.

11.     Plaintiff duly filed her administrative charge before the U.S. Equal Employment Opportunity Commission ("EEOC") on December 20, 2017 and received a Right to Sue letter on March 26, 2020.

### III.     COMMON FACTUAL ALLEGATIONS

12.     Schlumberger rig employees work in desolate and remote areas, with the nearest town an hour (or more) away by car. An onshore rig site consists only of the oil rig itself and several trailers that house employees working on the rig. Employees ordinarily will not encounter a single person on the site that is not working on the rig.

 

*Schlumberger True 36 Rig Site (North Dakota)*
*with Employee Trailers in the Background*

*Schlumberger Trinidad 100 Rig (Texas)*

13.     Schlumberger has long known that women who work on rigs are subjected to gender-based harassment and discrimination.  In 2007, Schlumberger hired an independent third-party to determine whether field locations "were suitable locations for female employees."  Yet the discrimination, sexual harassment, and sexual assaults to which women are subjected have continued unchecked.  Upon information and belief, one woman who interviewed for a position at Schlumberger was even told—during her job interview—that she would need to be on birth control if she wanted the job.

14.     This anti-woman animus does not exist in a vacuum.  Schlumberger's male-dominated culture fosters an environment in which sexual harassment is rampant and openly tolerated on oil rigs.  Rig employees who have worked for Schlumberger in many different states across the country have confirmed that the pervasive discrimination, hostile work environment, and culture of disrespect towards women is consistent across the various parts of the country in which they worked.  Field locations and rigs are predominantly staffed with male employees; there is often only one or two women working on a rig.

15.     "Gender equality," one former employee wrote, "is far from being practiced in field operations" on rigs.  Another employee described a "toxic work environment" and "non-inclusive culture" that was "a nightmare" for women.  One woman claimed that the "blatant boys club attitude" made Schlumberger "a horrible company to work for as a strong minded woman."  Yet another employee stated that "harassment, retaliation, [and] discrimination makes [Schlumberger] a rough place to work," citing a culture of viciousness, innuendos, rumors, ostracization, and retaliation.  Multiple employees described a "good ole boy culture" that dictated management decisions.  Another employee criticized Schlumberger's treatment of women and advised management to learn equality and respect.

16.     According to women who have worked on rigs, instances of sexual assault and sexual harassment are standard operating procedure.  Their own experiences of being groped, harassed, and discriminated against on a regular basis are consistent with the experiences of other women at the Company.  One woman filed a lawsuit against Schlumberger after she learned she had been secretly filmed by a hidden camera that was placed in her bedroom on a rig.[3]  Another woman complained about a male employee who broke into her room, took a shower, and then made sexual advances towards her while wearing only a towel.

17.     Men at Schlumberger frequently make inappropriate, demeaning, and gendered comments to the women with whom they work on rigs.  Male employees refer to women as "cunts" and "bitches."  Some men address their women by using demeaning terms such as "sweetie," "young lady," and "darling."  Men make sexual jokes and inappropriate comments

---

[3] Nick Valencia, *Oil rig worker says she was secretly recorded, files $1 million lawsuit*, CNN (April 1, 2016), *available at* https://www.cnn.com/2016/03/31/us/transocean-spy-camera-lawsuit/index.html (A female employee working on rig discovered secret recording devices had been installed in her and other female employees' private sleeping quarters . When she reported the incident, Schlumberger supervisors were dismissive and failed to adequately investigate or identify the perpetrator. The plaintiff remarked of her experience, "On the rig, it's very hard to gain respect . . . being a woman in a man's world[.]").

about women's physical appearance, such as complimenting them for having "a great ass," commenting on their breasts, and critiquing their choice of clothing as being too revealing, too distracting, or not revealing enough. They compare the physical attributes of women who currently or previously worked on the rig, focusing only on their appearance rather than their professional capabilities. Men create and spread vicious rumors about the women working on rigs, such as accusing them of "sleeping around," which persist long after that woman has moved on from the rig.

18. The "good ole boys club" mentality promoted by Schlumberger has hindered women's opportunities for advancement at the Company. Numerous women have claimed that they were routinely denied advancement opportunities that were instead awarded to similarly situated men. For example, one woman who worked on a rig claimed that she "ran into increasing discrimination against women" at Schlumberger and, when there were limited advancement opportunities for women, "it became clear that the company did not take gender balance seriously." Another woman who was hired as an engineer was instructed to perform only administrative and secretarial work (including cleaning homes and warehouses).

19. Male employees intentionally conduct themselves in a way that interferes with or sabotages women's job performance and ability to complete their work. Men will purposefully arrive late to work on a regular basis, offering no excuse to the women with whom they work other than "I know how to do my job better than you." Men ignore or argue with women who attempt to give them any direction or suggestion in the workplace. When women try to assert themselves, male employees claim that they "don't like a younger woman telling [them] what to do" and accuse women of "mouthing back." Male employees take credit for women's successes and blame the women for any problems that occur on the rig.

20.     Schlumberger's policies, practices, and procedures—including its practice of minimizing, ignoring, mishandling, or otherwise failing to adequately respond to women's complaints—have allowed the sex discrimination and sexual harassment to which women are subjected to exist on a systemic, Company-wide basis.

21.     Schlumberger's Human Resources department offers no recourse for women. According to one former Schlumberger employee, "Employees that complain to [Human Resources] about harassment . . . are immediately blacklisted. [Human Resources] is not your friend at this company, they are your enemy." Indeed, women at Schlumberger have described a "long history" of Human Resources actively searching for an excuse to terminate or otherwise force women out of the Company once they have complained about harassment or discrimination—even if it means deviating from Schlumberger's own policies.

22.     Human Resources routinely ignores complaints of sexual harassment and discrimination, declines to investigate allegations, and takes little or no action to correct the behavior or protect the women who have complained. One woman who reported discrimination and sexist comments was told by the Head of Human Resources that "everything was in [her] head." Another woman stated that she complained to Human Resources after her manager told her that he did not want to "waste his time" on her "girl problems," but Human Resources took no action. Yet another employee complained of sexual harassment and retained a lawyer when Human Resources took no action.

23.     Like Human Resources, managers and supervisors at Schlumberger do not take women's discrimination and harassment complaints seriously. For example, one woman's complaint of discriminatory conduct on the rig was dismissed by her manager as "oil field talk." Another woman, who was also sexually harassed, complained to her second-line manager after

her direct manager berated and insulted her for raising concerns; she was ignored. Yet another women was accused by her manager of "tearing the group apart" after she complained to Human Resources about being groped on the rig.

24. Even Schlumberger's own written policies promote sex discrimination and sexual harassment within the Company's ranks and make it difficult for women to find recourse. For example, Schlumberger has implemented and maintained a policy for reporting cases of harassment that has a discriminatory disparate impact on women who seek redress for harassment. The Company's policies instruct employees who have been harassed to, as a first step, *"politely" confront the harasser themselves*: "Politely and firmly confront the person doing the harassing. State how you feel about his / her actions. Politely request that the person stop the unwanted behavior because you feel offended, uncomfortable, or intimidated." The policy then states that, "if the harassment continues," employees should contact their supervisor. If the supervisor is unable to solve the problem, the policy directs employees to contact "the next level of supervision, or another manager." The policy finally directs employees to contact their Personnel Manager if, after the three previous levels of reporting—first to the harasser, then to a supervisor, then to another supervisor—the "problem is still unresolved." The policy also warns employees that, "[g]iven the nature of this type of discrimination, Schlumberger also recognizes that false accusations of harassment can have serious effects on innocent individuals."

25. In addition, Schlumberger maintains a policy governing the recommended standards for field locations that has a disparate impact on women. For example, the policy explicitly allows for women to share living quarters (e.g. a trailer) and a bedroom with male employees. As a result, women (including Ms. Saidman) are often forced to share their living and sleeping accommodations with men who work on the rig, creating an environment that

invites harassment and discrimination of women. As another example, the policy provides that only men will be assigned to work at certain worksites, significantly limiting the career opportunities and work locations available to women.

26. Schlumberger's actions and inactions have allowed a hostile work environment to greatly interfere with the terms and conditions of women's employment at the Company. As one woman who worked on a rig succinctly warned potential employees: "I would definitely not recommend this company for any female."

## IV. PLAINTIFF'S FACTUAL ALLEGATIONS

27. Plaintiff Sara Saidman graduated *summa cum laude* from the University of Pittsburgh in 2016 with a Bachelor of Science degree in Chemical Engineering and minors in Petroleum Engineering and Chemistry. During college, Ms. Saidman was the co-president of Omega Chi Epsilon, a Chemical Engineering honor society. In December 2015, Ms. Saidman accepted an offer to work at Schlumberger as a Measurements While Drilling Field Engineer ("MWD"). Ms. Saidman began her employment with Schlumberger on May 17, 2016, shortly after her college graduation. Like many field workers, Ms. Saidman regularly moved from rig to rig based on staffing needs. While employed by Schlumberger, Ms. Saidman worked at various rigs located in Texas, New Mexico, North Dakota, and Oklahoma.

28. In her capacity as an MWD, Ms. Saidman was responsible for assembling the drill tool, monitoring it for any malfunctions during drilling, and building, programming, testing, and preparing tools for downhill drilling services. Ms. Saidman was also responsible for addressing and reporting changes to pressure, torque, slipstick, drilling angles, depth and direction, and other drilling data.

29. Ms. Saidman excelled at her job. In the summer of 2016, she was part of a team that broke a Schlumberger record for fastest drilling time using a specific tool. By fixing a depth tracking issue during the job, Ms. Saidman was instrumental in the achievement of this record. She received a positive annual performance review for 2016, and was promoted from Grade G98 to Grade G99 in January 2017—just eight months after her employment at the Company began.

30. Ms. Saidman was subjected to rampant discrimination and sexual harassment throughout her employment. Ms. Saidman was forced to share both a trailer and her bedroom (neither of which had locks on the doors) with three of her male colleagues, several of whom encouraged the other men who worked on the rig to break into Ms. Saidman's room at night and ignore her if she did not consent to sexual activity (assuring them that "she likes it whether or not she wants it" and "the more she screams, the more she wants it"). In addition, Ms. Saidman's male colleagues referred to her by demeaning and offensive terms (such as "cunt," "bitch," and "slut"), made inappropriate comments about her physical appearance (such as remarking that she had a "great ass" that was "too distracting" for them in the workplace), and told her that she "does not deserve equal pay" because she is a woman.

31. When Ms. Saidman began working at Schlumberger, she quickly learned that it was common knowledge that opposing sexual discrimination on rigs would irreparably damage or end a woman's career with the Company. Ms. Saidman consistently heard stories of women being disparaged and terminated for formally reporting—or even discussing with co-workers— the rampant sexism and poor treatment that they faced on rigs. Multiple employees advised Ms. Saidman against reporting the discrimination and harassment she was facing. For example, Ms. Saidman was told to "pick her battles" and "leave it alone," that reporting her experiences to Human Resources would "backfire" on her, to "learn to deal with it," to "get over [herself]," and

to "keep her head down" and "not make a fuss" because making a complaint would "torpedo" her career as a woman at the Company.

**A.      H&P 636 Rig in New Mexico (June 2016 – August 2016)**

32.     From June 2016 until August 2016, Ms. Saidman worked on the H&P 636 rig in New Mexico.

33.     Days into her first rig assignment, Ms. Saidman's trainer and later supervisor, MWD Field Specialist Leslie Bullard ("Field Specialist Bullard"), told Ms. Saidman that she should not wear shorts outside because she had a "a great ass" and it was "too distracting" for male workers.  Field Specialist Bullard informed Ms. Saidman that her "butt" had been the topic of discussion at that morning's safety meeting.  When Ms. Saidman expressed discomfort with this, Field Specialist Bullard advised Ms. Saidman to "keep her head down" and "not make a fuss."  When Ms. Saidman later expressed her discomfort with Field Specialist Bullard's comments to a male employee who also worked on the rig, he replied that she did "have a great ass, though."

34.     Ms. Saidman was groped while working on the H&P 636 rig.  A Directional Driller who witnessed the event advised Ms. Saidman against reporting it, warning her that it "wouldn't end well" for her.

35.     This was not the only instance of sexual harassment on the H&P 636 rig.  For example, a male employee on the H&P 636 rig made unwanted sexual advances toward Ms. Saidman, which she rejected.  The same employee warned Ms. Saidman to be careful around the rig crew because she was "young and new" and he "didn't want to see anything happen" to her.  Ms. Saidman was also "cat called" by men on the rig.

**B.      True 36 Rig in North Dakota (August 2016 – September 2016)**

36.     Ms. Saidman next worked on the True 36 rig in North Dakota from August 19, 2016 until September 4, 2016.  While working on the True 36 rig, a male employee frequently boasted to Ms. Saidman that the men on the rig would hire "hookers and strippers" from Vegas and fly them to North Dakota.

**C.     Patterson 290 Rig in Oklahoma (September 2016 – October 2016)**

37.     Ms. Saidman was assigned to the Patterson 290 rig in Oklahoma from September 2016 through October 2016.

38.     She continued to face discrimination on the Patterson 290 rig.   While Ms. Saidman was having a conversation with three men who worked on the rig, one man claimed that he was not voting for Hillary Clinton because "she's a woman, and you can't trust women. They're too emotional."   The same man asked Ms. Saidman if she cooked and then said, "you can't trust a woman who doesn't cook."

39.     A male Directional Driller working on the rig once invited Ms. Saidman to a group gathering offsite.  When she arrived, however, she learned that it was just the two of them. The man repeatedly made sexual advances towards Ms. Saidman, ignoring her demands that he stop because she was uncomfortable.  The man then insisted that Ms. Saidman stay at his house that night.  She hid in the bathroom to escape the man before eventually driving back to the rig.

**D.     H&P 617 Rig in New Mexico (October 2016 – January 2017)**

40.     From October 2016 through January 2017, Ms. Saidman worked on the H&P 617 rig in New Mexico.

41.     Almost immediately upon arriving on the H&P 617 rig, Ms. Saidman was subjected to a barrage of sexist and offensive comments by her male colleagues.

42.     Directional Driller Mark Seidenberger, a former field service manager with almost 30 years of experience with the Company, frequently called women "cunts" and

"bitches." On one occasion, he told Ms. Saidman that a woman was "a fucking cunt idiot, but she had the body of a hooker, and a tramp stamp which is really hot." He told Ms. Saidman that if women on the rig did not like how they were treated, "they can shut up or get out." He also told Ms. Saidman stories about leaving the rig to visit strip clubs with Schlumberger management. On another occasion, he claimed that he hoped "terrorists bomb the east coast and wipe out Hillary supporters."

43. Another male employee told Ms. Saidman that she was "attractive, but would be more attractive as a brunette." Yet another male worker frequently made offensive comments about lesbians and women in general.

44. The men on the H&P 617 rig also displayed their blatant disrespect for women by attempting to undercut Ms. Saidman and minimize her achievements at work. When Ms. Saidman did exceptionally well with her work assignments, male employees would give other men all of the credit for Ms. Saidman's work and applaud their performance, despite the fact they had no hand in the task at issue. On a regular basis, Ms. Saidman was also unfairly blamed by the men for any difficulties or issues that arose with respect to work-related tasks.

45. As a result of the hostile work environment on the H&P 617 rig, Ms. Saidman began to search for a transfer.

46. At the end of Ms. Saidman's final day working on the H&P 617 rig, she was directed to visit the nearby Nomac 56 rig first thing in the morning to handle an "incident." When Ms. Saidman arrived at the Nomac 56 rig on the morning of January 10, 2017, she learned that the "incident" she had been tasked with handling was a man who was wielding knives and threatening the crew. When Ms. Saidman reported this to Workforce Coordinator Riley

Swanston ("Coordinator Swanston"), he ignored her concerns and instructed her to "babysit" the man and "clean up his mess."

47.     When Ms. Saidman entered the office on the Nomac 56 rig, she was shocked to find that the office was filled with calendars of nude women, nude magazines, pornographic photographs, and handwritten comments "ranking" women on their physical appearance.

**E.      Independence 211 Rig in Texas (January 2017 – February 2017)**

48.     Ms. Saidman worked on the Independence 211 rig in Texas from January 2017 until February 2017.  While on the Independence 211 rig, Ms. Saidman was warned that the rig crew were "animals" and she should keep a knife on her at all times for protection.

**F.      Nomac 55 Rig in Texas (March 2017 – April 2017)**

49.     On March 2, 2017, Ms. Saidman began working on the Nomac 55 rig in Texas. Out of the 25 workers assigned to Nomac 55, Ms. Saidman was the only woman.

50.     Schlumberger assigned Ms. Saidman to a two-bedroom trailer that she shared with three men: Directional Driller Geno Aguilar ("Directional Driller Aguilar"), Directional Driller Mike Moore ("Directional Driller Moore"), and Directional Driller Jess Sheldon ("Directional Driller Sheldon").  The bedroom doors did not have locks on them.  Ms. Saidman shared a bedroom with Directional Driller Moore.  Although Ms. Saidman and Directional Driller Moore were on different schedules, he frequently entered the bedroom while Ms. Saidman was changing or sleeping, offering her no privacy or security.

51.     Within days of Ms. Saidman's arrival, male employees on the Nomac 55 rig began to make inappropriate and gendered comments to Ms. Saidman.  Directional Driller Aguilar, in particular, targeted Ms. Saidman and began to harass her on a daily basis.

52.     For example, Directional Driller Aguilar told Ms. Saidman that women did not deserve equality because they were not equal to men.  He informed Ms. Saidman that she "did

not deserve equal pay" because she was a woman and "[did] half the work." He also demanded that Ms. Saidman clean the trailer that they lived in, including his own room, asserting that, "as a woman, [she is] supposed to clean." When Ms. Saidman was not on the rig, Directional Driller Aguilar joked that she was "sleeping around town." Ms. Saidman, like most of the male employees on the rig, wore loose fitting coveralls while she worked. Directional Driller Aguilar criticized her choice of clothing and encouraged her to instead wear tight leggings or jeans.

53.     Directional Driller Aguilar also discriminated and harassed Ms. Saidman because she was Jewish, telling Ms. Saidman that she was not "God good" and would go to hell.

54.     In mid-March 2017, there was a "casing break"[4] on the Nomac 55 rig. Schlumberger instructed Ms. Saidman to stay at a "mancamp" (an offsite lodging location) in Midland, Texas. While Ms. Saidman was asleep in her room at the mancamp, a strange man entered her room uninvited and unannounced at approximately 3:42 a.m. on March 23, 2017. Startled, Ms. Saidman jumped out of bed and ordered the man to leave her room multiple times. The man refused to leave at first, but eventually acquiesced.

55.     Later that day, Ms. Saidman returned to the Nomac 55 rig. On her way back to the rig, she stopped in Schlumberger's Midland, Texas office to report the incident to Administrative Assistant Allison Hensley ("Administrative Assistant Hensley"). When Ms. Saidman arrived back on the Nomac 55 rig, she immediately reported the event to Directional Driller Aguilar.

56.     After learning what had happened to her on the mancamp, Directional Driller Aguilar told Ms. Saidman that she "liked strange men entering her room in the middle of the

---

[4] During a "casing break," the drill would be removed from the hole and cement would be poured into the perimeter of the freshly drilled segment to provide stability and structure to the well. Casing breaks typically lasted between a couple days and one week, during which rig employees typically stay at off-site lodging sites called "mancamps."

night." He asked her if strange men breaking into her room at night was her "kink" (sexual preference). Ms. Saidman objected to Directional Driller Aguilar's response and firmly told him that his comments were inappropriate and uncalled for. Directional Driller Aguilar responded Ms. Saidman that she was "a bitch"—his standard response each time she demanded that he stop harassing her.

57.    Undeterred, Directional Driller Aguilar continued to falsely and maliciously tell the other employees on the rig—all of whom were male—that Ms. Saidman "liked it" when strange men entered her bedroom uninvited ("the more men, the better") in the middle of the night.

58.    Directional Driller Aguilar also told Ms. Saidman's male colleagues that they should ignore Ms. Saidman if she resisted or yelled during a sexual encounter. Directional Driller Aguilar assured the men working on the rig that Ms. Saidman **"likes it whether or not she wants it,"** and resisting sexual advances was her "kink," or just part of a game she liked to play. On one occasion, Directional Driller Aguilar pointed a truck driver towards Ms. Saidman and announced, "See her? She likes strange men coming into her room at all hours of the night. **The more she screams, the more she wants it."**

59.    The other men on the Nomac 55 rig—including Directional Driller Moore, with whom Ms. Saidman was forced to share a bedroom—began to join in with Directional Driller Aguilar in harassing Ms. Saidman.

60.    Because the trailer to which Ms. Saidman was assigned (and shared with three men) did not have any locks on the doors, Directional Driller Aguilar's encouragement of men to "come into her room at all hours of the night" and declaration that "the more she screams, the more she wants it" caused her extreme emotional distress. Because any man on the rig site could

walk into her room at any time, Ms. Saidman feared for her safety. Indeed, Directional Driller Moore began to enter their shared bedroom during his shift while Ms. Saidman was sleeping in violation of Schlumberger policies. Ms. Saidman went nights without sleeping and developed depression and anxiety.

61.     A few days later, on March 28, 2017, Ms. Saidman overheard several men on the rig joking about how she "wanted strange men to come into her room during the night" and she "preferred them uninvited."

62.     Later that day, Ms. Saidman received the following text message from an unknown number asking Ms. Saidman to get a hotel room with her because Directional Driller Aguilar (identified by his first name, "Geno") said that it was alright:

iMessage
Tue, Mar 28, 1:38 PM

> Hey I hope you don't mind I got your number. Stay in town tonight and I'll get a room 😉

> Geno said it's ok

63.     On or around March 29, 2017, one of the pins from the pipe screen broke on the rig. Directional Driller Aguilar attempted to fix the break, but was unable to find the tools he needed. Ms. Saidman immediately offered to retrieve her toolkit, which did have the proper tools, and fix the break herself. Directional Driller criticized her for not getting her toolkit fast enough and threatened to report her to the Company's corporate office.

64.     Later that day, Ms. Saidman wrote to Coordinator Swanston, to report Directional Driller Aguilar's unfair conduct. Coordinator Swanston said that Directional Driller Aguilar's conduct was "ridiculous," but told Ms. Saidman that he was "all talk" and she should "just

ignore" it, because "some [Directional Drillers] will be like that." The following day, Ms. Saidman also reported the incident to the Service Delivery Manager, who assured her, "Just keep doing what you're doing. You won't get any complaints from this side of things."

65. On or around March 29, 2017, Directional Driller Aguilar approached Ms. Saidman, who was sleeping in their shared trailer, and roughly shoved her awake. Directional Driller Aguilar yelled that Ms. Saidman was "worthless", "a slut," a "lazy ass," and could not do her job because she was a "girl." He stated that "if [Ms. Saidman] were a guy, we wouldn't have a problem," and told her that he was going to ask Schlumberger's corporate office to replace her.

66. Directional Driller Aguilar and Directional Driller Moore then proceeded to have a loud conversation near Ms. Saidman, in which they discussed their preference for a male employee to replace Ms. Saidman.

67. Shortly after this encounter, Ms. Saidman again wrote to Coordinator Swanston to report Directional Driller Aguilar's behavior and ask that she not be forced to work with him anymore. Ms. Saidman reported Directional Driller Aguilar's discriminatory comments, such as his remarks that she "didn't deserve equal pay" because she is a "lazy bitch" and his preference for a man to replace her. She further reported that Directional Driller Aguilar was threatening to call Schlumberger and have her replaced. Coordinator Swanston acknowledged that Directional Driller Aguilar's comments were "not acceptable," but did not take any action.

68. Upon information and belief, Directional Driller Aguilar did call the Midland office that day and falsely reported that Ms. Saidman had been late to that morning's safety meeting.

69. On March 30, 2017, Ms. Saidman contacted Coordinator Swanston again to request an update regarding her request that she be moved so that she would not have to work

with Directional Driller Aguilar. She informed him that Directional Driller Moore, who was also harassing her, had a lengthy conversation with Directional Driller Aguilar in their shared living quarters in which they disparaged her because of her gender. Specifically, Ms. Saidman informed Coordinator Swanston that the men "stood in the living room [of their shared trailer] and talked about how I'm a lazy ass because I'm a woman."

70. The following day, on March 31, 2017, Ms. Saidman overheard Directional Drillers Aguilar, Moore, and Sheldon (the three men with whom she shared a trailer) having a conversation in which they claimed she was "incompetent" because she was a "girl."

71. A few hours later, Ms. Saidman learned that Directional Driller Aguilar intentionally sent District Manager Shadi Mussa ("DM Mussa") an inaccurate copy of her work journal, which made it look like she had performed far less work than she actually had, in an attempt to get her disciplined. However, because Ms. Saidman had already sent Coordinator Swanston and DM Mussa an accurate version of her work journal, they knew that the version Directional Driller Aguilar had sent them was fabricated and inaccurate.

72. Directional Driller Aguilar told Ms. Saidman that Schlumberger management contacted him and told him that they would "look out for him" as long as he "covers his ass." Upon information and belief, Directional Driller Aguilar admitted to Schlumberger that he behaved inappropriately but received a mere slap on the wrist for his conduct.

73. On April 1, 2017, Ms. Saidman told Sales Support Engineer Lindsay Keith ("Sales Support Engineer Keith") that Directional Driller Aguilar had intentionally deleted her work journal. Sales Support Engineer Keith told Ms. Saidman that Directional Driller Aguilar was infamous within Schlumberger for his behavior and had a running list of employees who refused to work with him. She assured Ms. Saidman that she would speak to Directional Driller

Aguilar's manager, Workforce Coordinator Daniel Beauchamp ("Coordinator Beauchamp"), about the behavior. Upon information and belief, Sales Support Engineer Keith never spoke with Coordinator Beauchamp or Directional Driller Aguilar.

### G.     Trinidad 100 Rig in Texas (April 2017)

74.     On April 2, 2017, Ms. Saidman began working on the Trinidad 100 rig in Texas.

75.     On April 4, 2017, Ms. Saidman wrote to Coordinator Swanston to again report Directional Driller Aguilar's ongoing harassment, discrimination, and retaliatory fabrication of her work journals.

76.     On April 4, 2017, Ms. Saidman submitted a written complaint to DM Mussa, Coordinator Beauchamp, and Coordinator Swanston that comprehensively outlined the harassment, discrimination, and retaliation she faced on the Nomac 55 rig.

77.     The following day, Human Resources Representative Andres Zorilla ("HR Representative Zorilla") contacted Ms. Saidman and asked to speak with her. When Ms. Saidman asked if he was contacting her regarding her complaint, he had no idea what she was talking about. Ms. Saidman forwarded her complaint to HR Representative Zorilla.

78.     When Ms. Saidman did not receive a response, she submitted her complaint to the Company's EthicsPoint system around 7:00 a.m. on April 12, 2017 and further complained that she was facing retaliation from management as a result of her previous complaints.

79.     Approximately four hours later, at 11:38 a.m. on April 12, 2017, Ms. Saidman was suddenly informed that she would be required to immediately submit to a drug and alcohol test. Ms. Saidman easily passed the drug and alcohol test. Later, Administrative Assistant Hensley informed Ms. Saidman that HSE Process Lead Lori Rose ("Process Lead Rose") had tried to convince her to change the reason code on the test form to "random."

80.     Although Schlumberger's policies promise that drug and alcohol tests will remain confidential, Ms. Saidman's colleagues immediately informed her that false rumors were circulating claiming that Ms. Saidman's alcohol test came back with a BAC of 1.8%. Her colleagues claimed that they were being told this by multiple sources—including Coordinator Beauchamp.

81.     Later that night, at 8:21 p.m. on April 12, 2017, Ms. Saidman updated her EthicsPoint complaint to report management's retaliatory decision to perform a drug and alcohol test on her mere hours after she complained of discrimination and harassment. Ms. Saidman also complained about management violating the Company's confidentiality policies and spreading false rumors about the results of her breathalyzer test. Finally, Ms. Saidman supplemented her previous complaints with details of Directional Driller Aguilar's religious discrimination.

82.     The following day, on April 13, 2017, Ms. Saidman was called into a meeting with Coordinator Swanston, HR Representative Zorilla, HSE Process Lead Lori Rose, and Coordinator Beauchamp, who now claimed—for the first time—that they suspected Ms. Saidman of violating the Company's driving policies. Yet HSE Process Lead Lori Rose confirmed that Ms. Saidman's driving record had "not even been on her radar" before then. The Company then suspended Ms. Saidman, effective immediately, while it investigated her "violations" of the driving policy.

83.     Immediately after Ms. Saidman was suspended, she met with HR Representative Zorilla privately to discuss the multiple complaints of discrimination and retaliation that she had filed. When Ms. Saidman recounted Directional Driller Aguilar's sexist and hostile comments, HR Representative Zorilla replied, "So you don't know what a joke is?"

84.     Later in the evening on April 13, 2017, Ms. Saidman submitted an additional complaint through EthicsPoint reporting the Company's retaliatory response to her previous complaints.

85.     On April 18, 2017, Ms. Saidman again updated her EthicsPoint complaint to include further retaliation after she was told that Coordinator Beauchamp disclosed confidential information regarding her Human Resources investigation and her suspension status to one of Ms. Saidman's colleagues.

86.     On May 11, 2017, Ms. Saidman returned from her suspension.  Schlumberger promptly terminated her employment.

87.     Schlumberger claimed that it was terminating Ms. Saidman for committing minor policy infractions.  However, this was mere pretext.  Other Schlumberger employees—most of whom are male—regularly committed the same or far worse infractions, often documenting and flaunting them on public forums.  Yet Schlumberger did not discipline or terminate these employees for their policy violations.  Indeed, one Schlumberger employee told Ms. Saidman that she was terminated as a result of a "witch hunt" by the Company.

88.     Schlumberger intentionally and maliciously terminated Ms. Saidman in retaliation for the many complaints alleging discrimination, sexual harassment, and retaliation.  Indeed, this is consistent with Schlumberger's well-known history of unlawfully terminating women who oppose unlawful treatment.  Schlumberger's actions send a clear message to other women at the Company that opposition to discriminatory treatment will result in swift dismissal. Schlumberger's malicious, wanton, and reckless actions have caused Ms. Saidman considerable emotional distress, reputational harm, and financial loss.

89.     When Ms. Saidman began working at Schlumberger, she was an enthusiastic, confident, and outgoing individual who described herself as a "tough girl." One year later, after enduring constant sexual harassment, discrimination, and retaliation, Ms. Saidman was unrecognizable. She described her experiences at Schlumberger as "a living hell" from which there was no escape. Her mental and physical health deteriorated as the harassment continued unabated, even after her attempts to have the Company intervene. She experienced depression, anxiety, insomnia, nightmares, and periods of extreme stress, which continue to this day. This emotional distress has manifested itself in physical symptoms such as weight loss and hives/rashes. Ms. Saidman's experiences at Schlumberger have impacted her professional career and her personal life in nearly every possible way.

## V.     CLASS ACTION ALLEGATIONS

90.     Plaintiff and Class Representative Saidman re-alleges and incorporates by reference each and every allegation in the Complaint as though fully set forth herein.

91.     Plaintiff and Class Representative Saidman sues on behalf of herself individually and on behalf of a class of similarly-situated individuals pursuant to Federal Rule of Civil Procedure 23(b)(3). Plaintiff asserted claims on behalf of herself and the Class Members in her charge submissions to the EEOC.

92.     Schlumberger tolerates and cultivates a discriminatory and hostile working environment for women who work in field positions. Schlumberger has engaged in and continues to engage in a pattern or practice of discrimination against women employees. Schlumberger's employment policies, practices, and procedures have been implemented in an intentionally discriminatory manner and/or have had an adverse disparate impact on women employees. The Company has permitted the harassment of women employees to go unchecked,

resulting in a hostile work environment for women employees; has retaliated against women who have protested the Company's discriminatory policies, practices, and procedures; and has unlawfully terminated the employment of women employees.

### A. Rule 23 Class Definition

93. The proposed Class consists of all women who are current or former non-managerial employees of Schlumberger who worked in the field at rigs in the United States, including without limitation Field Engineers, Directional Drilling Engineers, Field Specialists, Field Technical Analysts, Maintenance Engineers, Equipment Operators, and/or Maintenance Technicians, from February 23, 2017 until the date of judgment. Excluded from the Class are any individuals who at any point acted as a manager or supervisor of the Plaintiff.

94. Plaintiff reserves the right to modify this Class definition.

### B. Efficiency of Class Prosecution of Class Claims

95. Certification of the proposed Class is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiff and the Class.

96. Plaintiff's individual claims, as Class Representative, require resolution of the common questions concerning whether Schlumberger has engaged in a pattern and/or practice of sex discrimination against its women employees, and whether its policies, practices, and procedures have an adverse effect on the Class. The Class Representative seeks remedies to eliminate the adverse effects of such discrimination in her own life, career, and working conditions and in the lives, careers, and working conditions of the class members, and to prevent Schlumberger's continued sex discrimination.

97. The Class Representative has standing to seek such relief because of the adverse effect that such discrimination has had on her individually and on women employees at

Schlumberger generally. Schlumberger caused Plaintiff's injuries through its discriminatory practices, policies, and procedures and failure to remedy or correct such discrimination and the discriminatory disparate impact that these practices have had on women employees. These injuries are redressable through systemic relief, such as the monetary damages sought in this action.

98.     To obtain relief for herself and the class members, the Class Representative will first establish the existence of systemic sex discrimination and hostile work environment as the premise for the relief she seeks. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

99.     Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the Class members, and the Company.

**C.      Numerosity and Impracticability of Joinder**

100.     The Class that the Class Representative seeks to represent is too numerous to make joinder practicable. In addition, joinder is impractical as the employees are physically based in different locations throughout the United States. Fear of retaliation on the part of the Company's present and former women employees is also likely to undermine the possibility of joinder.

101.     Upon information and belief, the proposed Class consists of more than 40 current and former women employees during the liability period. The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Schlumberger.

**D.      Common Questions of Law and Fact**

102.	Prosecuting the Class Representative's claims will require the adjudication of numerous questions of law and fact common to her claims and those of the Class she seeks to represent.

103.	The common questions of law include, *inter alia*: (a) whether Schlumberger has engaged in unlawful, systemic sex discrimination in its policies, practices, and procedures, including but not limited to those related to sexual harassment, anti-discrimination, the making of complaints, investigating and responding to complaints, personnel management, training, and discipline; (b) whether Schlumberger's employment policies had a disparate impact on the Class; (c) whether Schlumberger engaged in a pattern or practice of discrimination under the disparate treatment theory of liability; and (d) whether the discrimination and harassment complained of was so severe or pervasive as to alter the conditions of the Class's employment and create a hostile or abusive working environment.

104.	The common questions of fact include, *inter alia*: (a) whether Schlumberger has implemented policies and/or practices that lack appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) whether Schlumberger had a policy and/or practice of minimizing, ignoring, mishandling, or otherwise failing to adequately respond to complaints and incidents of sex discrimination and hostile work environment; (c) whether Schlumberger had a policy and/or practice of minimizing, ignoring, or covering up evidence of sex discrimination and hostile work environment in the workplace; (c) whether Schlumberger discouraged women from reporting sex discrimination, sexual harassment, and/or a hostile work environment; (e) whether the Class was subjected to offensive or sexual language and conduct during their employment; and (f) whether Schlumberger's employees with

supervisory authority have been, or reasonably should have been, aware of the sexually hostile work environment for class members.

105.     Upon information and belief, the Company's employment policies, practices, and procedures are not unique or limited to any office or job site; rather, they apply uniformly and systematically to employees throughout the Company, occurring as a pattern or practice at Schlumberger rigs. They thus affect the Class Representative and Class members in the same ways regardless of the location or job site in which they work.

### E.     Typicality of Claims and Relief Sought

106.     The Class Representative is a member of the Class she seeks to represent. The Class Representative's claims are typical of the claims of the proposed Class. The Class Representative possesses and asserts each of the claims she asserts on behalf of the proposed Class. She pursues the same factual and legal theories and seeks similar relief.

107.     Like members of the proposed Class, the Class Representative is a woman who was employed by Schlumberger during the liability period.

108.     The Class Representative and the Class members all share the same essential characteristics.  The acts and omissions to which Defendants subjected the Class Representative and the Class applied universally within the Class and were not unique to any Class Representative or Class member.

109.     The Class Representative and the Class have experienced differential treatment and conduct that gives rise to a hostile work environment.  This differential treatment occurs as a pattern and practice throughout all locations and work sites of the Company and has affected the Class Representative and the Class members in the same or similar ways.

110.     Schlumberger's failures, omissions, and inactions have affected the Class Representative and the Class members in the same or similar ways.  Schlumberger has failed to

create adequate policies and procedures to ensure its employees comply with anti-discrimination laws and has failed to adequately discipline men when they violate anti-discrimination laws. Schlumberger has failed to create adequate policies and procedures to ensure that women are protected from discrimination and/or a hostile work environment and have opportunities for redress. Schlumberger has failed to respond adequately or appropriately to evidence and complaints of discrimination. The Class Representative and class members have been affected in the same or similar ways by the Company's failure to implement adequate procedures to detect, monitor, and correct this pattern or practice of discrimination.

111. The relief necessary to remedy the claims of the Class Representative is the same as that necessary to remedy the claims of the proposed class members.

112. The Class Representative seeks the following relief for her individual claims and on behalf of the members of the proposed class: (a) back pay, front pay, and other equitable remedies necessary to make the employees whole from the Defendant's discrimination; (b) punitive and nominal damages to prevent and deter Schlumberger from engaging in similar discriminatory practices in the future; (c) compensatory damages; and (d) attorneys' fees, costs and expenses.

### F. Adequacy of Representation

113. The Class Representative is an adequate representative of the proposed Class.

114. The Class Representative's interests are coextensive with those of the members of the proposed Class that she seeks to represent in this case. The Class Representative seeks to remedy Schlumberger's discriminatory policies, practices, and procedures so women employees will not receive differential treatment or suffer a hostile working environment.

115. The Class Representative is willing and able to represent the proposed class fairly and vigorously as she pursues her similar individual claims in this action.

116.    The Class Representative has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity. The combined interests, experiences, and resources of the Class Representative and her counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Rule 23(a)(4).

G.    **Requirements of Rule 23(b)(3)**

117.    The common issues of fact and law affecting the claims of the Class Representative and proposed Class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether Schlumberger has engaged in sex discrimination and facilitated a hostile work environment

118.    Schlumberger has acted or refused to act on grounds generally applicable to the Class Representative and the proposed Class by engaging in sex discrimination and facilitating a hostile environment through its failure to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of hostile work environment, sexual harassment, and sex discrimination.  Schlumberger's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested relief for the Class as a whole.

119.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representative and members of the proposed Class.  The cost of proving Schlumberger's pattern and practice of discrimination makes it impracticable for the Class Representative and class members to pursue their claims individually.

120.    By virtue of the pattern and practice of discrimination and hostile work environment at Schlumberger, the Class Representative and Class members eligible for monetary

remedies for losses caused by this systemic discrimination, including back pay, front pay, compensatory damages, and other relief.

121. Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

## VI. COUNTS

### COUNT ONE
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000(e), *et seq.*
### SEX DISCRIMINATION
### *(On Behalf of the Class Representative and all Class Members)*

122. Plaintiff re-alleges and incorporates each and every allegation in this Complaint.

123. This Count is brought by the Class Representative individually and on behalf of all members of the Class.

124. Schlumberger was or is an employer of the Class Representative and the Class Members within the meaning of Title VII.

125. Schlumberger has discriminated against the Class Representative and all members of the proposed Class in violation of Title VII by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

126. Schlumberger has engaged in an intentional, systemic, Company-wide pattern and/or practice of discrimination by, among other things: subjecting the Class Representative and the Class to differential treatment and discriminating against them in the terms and conditions of their employment; minimizing, ignoring, mishandling, or otherwise failing to adequately respond to complaints and incidents of sex discrimination and hostile work environment; discouraging

women from reporting sex discrimination, sexual harassment, and/or a hostile work environment; and subjecting the Class Representative and the Class to a hostile work environment; and other forms of discrimination.

127. Schlumberger's policies, practices, and procedures have a disparate impact on the Class Representative and the Class, including, *inter alia*: Schlumberger's policy for reporting sexual harassment, which disadvantages and discriminates against women who seek to report instances of harassment; and Schlumberger's practice of minimizing, ignoring, mishandling, or otherwise failing to adequately respond to complaints and incidents of sex discrimination and sexual harassment, which allows a culture of gender-based harassment and discrimination to continue unchecked. These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the Class Representative and the Class with respect to the terms and conditions of their employment.

128. As a result of this disparate treatment and disparate impact discrimination, Schlumberger has treated the Class Representative and the Class differently from and less favorably than their male colleagues. This discrimination altered the terms and conditions of the Class Representative's and the Class's employment.

129. Schlumberger's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and the Class, entitling the Class Representative and all members of the Class to punitive damages.

130. Because of the continuous nature of Schlumberger's discriminatory conduct, which persisted throughout the employment of the Class Representative and the Class, the Class Representative and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

131. By reason of Schlumberger's discrimination, the Class Representative and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including punitive damages.

132. As a result of Schlumberger's conduct alleged in this Complaint, the Class Representative and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

133. As a further result of Schlumberger's unlawful conduct, the Class Representative and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. The Class Representative and the Class are entitled to recover damages for such injuries from Schlumberger under Title VII.

134. Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT TWO
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e, *et seq.*
### HOSTILE WORK ENVIRONMENT
#### *(On Behalf of the Class Representative and all Class Members)*

135. Plaintiff re-alleges and incorporates each and every allegation in this Complaint.

136. This Count is brought by the Class Representative individually and on behalf of all members of the Class.

137. Schlumberger was or is an employer of the Class Representative and the Class Members within the meaning of Title VII.

138. The Class Representative and the Class were subjected to unwelcome harassment on the basis of their sex, including but not limited to inappropriate, offensive, and/or

discriminatory gendered comments and unwelcome touching. This unwelcome harassment was both subjectively and objectively hostile and/or abusive.

139. The harassment the Class Representative and the Class were subjected to was so severe or pervasive as to alter the terms and conditions of their employment and create a hostile and/or abusive working condition. The Class Representative and the Class were frequently and repeatedly subjected to harassment and discriminatory conduct on the basis on their gender that was physically threatening, humiliating, and/or offensive. This conduct was so extreme that it unreasonably interfered with the Class Representative and the Class's work performance. amounted to a change in the terms and conditions of employment, and resulted in psychological harm.

140. As a result of the harassment, the Class Representative the Class suffered an adverse employment action, up to and including termination of their employment.

141. Schlumberger and its employees with supervisory authority knew or reasonably should have known of the harassment that permeated the workplace but failed to address it or take steps to prevent and correct the harassment. Schlumberger failed to exercise reasonable care to prevent and correct the harassment and hostile work environment, even after the Class Representative complained about harassment on several occasions.

142. Schlumberger created and perpetuated a hostile work environment by, among other things, engaging in a pattern and practice of minimizing, ignoring, mishandling, or otherwise failing to adequately respond to complaints and incidents of sex discrimination and sexual harassment; implementing and maintaining a discriminatory policy for reporting sexual harassment which disadvantages and discriminates against women who seek to report instances

of harassment; and discouraging women from reporting sexual harassment and/or a hostile work environment.

143.    Schlumberger's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and the Class, entitling the Class Representative and all members of the Class to punitive damages.

144.    Because of the continuous nature of Schlumberger's discriminatory conduct, which persisted throughout the employment of the Class Representative and the Class, the Class Representative and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

145.    By reason of Schlumberger's discrimination, the Class Representative and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including punitive damages.

146.    As a result of Schlumberger's conduct alleged in this Complaint, the Class Representative and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

147.    As a further result of Schlumberger's unlawful conduct, the Class Representative and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. The Class Representative and the Class are entitled to recover damages for such injuries from Schlumberger under Title VII.

148.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT THREE**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e-2(a),** *et seq.*
**RETALIATION**

*(On Behalf of Plaintiff)*

149.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

150.     At all relevant times, Schlumberger was an employer of the Plaintiff within the meaning of Title VII.

151.     Plaintiff engaged in protected activity that included, but is not limited to, complaining to Schlumberger about sex discrimination, religious discrimination, hostile work environment, and retaliation,

152.     Schlumberger retaliated against Plaintiff by, *inter alia*, wrongfully suspending her employment and wrongfully terminating her employment.

153.     Schlumberger's retaliatory acts against Plaintiff were a direct and proximate result of her protected activities.

154.     A reasonable person would find Schlumberger's retaliatory acts materially adverse and such acts would dissuade a reasonable person from complaining or opposing discrimination.

155.     Schlumberger's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff entitling her to punitive damages.

156.     Schlumberger's actions and failures to act have caused Plaintiff to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

157.     Plaintiff is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement (or front pay) and punitive damages.

158.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT FOUR**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e-2(a),** *et seq.*,
**WRONGFUL TERMINATION (DISCRIMINATION)**
*(On Behalf of Plaintiff)*

159.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

160.     At all relevant times, Schlumberger was an employer of the Plaintiff within the meaning of Title VII.

161.     Schlumberger terminated the employment of Plaintiff due to sex discrimination. Schlumberger's discharge of Plaintiff was an adverse employment action that materially and adversely changed the overall terms and conditions of their employment in violation of Title VII.

162.     Schlumberger's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff, entitling her to punitive damages.

163.     Schlumberger's discharge of Plaintiff caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

164.     Plaintiff is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement (or front pay) and punitive damages.

165.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**VII.     PRAYER FOR RELIEF**

Wherefore, Plaintiff, on her own behalf and on behalf of the Class, requests the following relief:

a.     Acceptance of jurisdiction of this case;

b. Certification of this case as a class action under Federal Rule of Civil Procedure 23, designation of the proposed Class Representative, Plaintiff Sara Saidman, as representative of this Class, and designation of Sanford Heisler Sharp, LLP and Shellist Lazars Slobin LLC as Class Counsel;

c. A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; and the applicable state and local laws;

d. An award of damages to the Plaintiff and the Class under Title VII, including back pay, front pay (in lieu of reinstatement), compensatory damages and punitive damages, in an amount not less than $100,000,000;

e. An award of litigation costs and expenses, including reasonable attorneys' fees;

f. An award of pre-judgment and post-judgment interest; and

g. Such other and further relief as the Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right to a jury.

Dated: June 23, 2020

Respectfully submitted,

*/s/ Todd Slobin*
TODD SLOBIN
Texas Bar No. 24002953
Federal ID No. 22701
tslobin@eeoc.net
MELINDA ARBUCKLE
marbuckle@eeoc.net
Texas Bar No. 24080773
Federal ID No. 2629125
**SHELLIST LAZARZ SLOBIN LLP**
11 Greenway Plaza, Suite 1515

Houston, Texas 77046
Telephone: (713) 621-2277
Fax: (713) 621-0993


*-- and –*

Michael D. Palmer (*pro hac vice* forthcoming)
Nicole E. Wiitala (*pro hac vice* forthcoming)
Carolin E. Guentert (*pro hac vice* forthcoming)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
mpalmer@sanfordheisler.com
nwiitala@sanfordheisler.com
cguentert@sanfordheisler.com

***Attorneys for Plaintiff and the Proposed Class***